UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ROBERT D. WALDRON and<br>CHRISTOPHER MILLS,<br><br>          Plaintiffs,<br><br>v.<br><br>GEORGE WESTON BAKERIES, INC.<br>and GEORGE WESTON BAKERIES<br>DISTRIBUTION, INC.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>) Docket no. 08-CV-266-P-S<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket # 5). The Court held an evidentiary hearing on September 9, 2008. Based on all of the evidence received at the hearing as well as the written submissions of the parties, the Court GRANTS the Motion.

**I.    STANDARD OF REVIEW**

For Plaintiffs to prevail on their motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure, each bears the burden of demonstrating (1) a likelihood of success on the merits, (2) irreparable injury, (3) that such injury outweighs any harm to the defendant, and (4) that the injunction would not harm the public interest. See, e.g., Largess v. Supreme Judicial Court, 373 F.3d 219, 224 (1st Cir. 2004). "The decision whether to grant relief is based on a balancing of the different factors, with likelihood of success playing a pivotal role." Id.  Irreparable harm is also a prerequisite. "To establish irreparable harm, however, a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business. It is usually

enough if the plaintiff shows that its legal remedies are inadequate. If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18-19 (1st Cir. 1996) (internal citations omitted).

## II.   FINDINGS

Plaintiffs, Robert Waldron and Christopher Mills, are two independent contractors who distribute bread and baked goods under distribution agreements with Defendants George Weston Bakeries, Inc. and George Weston Bakeries Distribution, Inc. (together, "GWBD" or "Defendant"). Mills has worked in this business since 1999 and has had a distribution agreement with GWBD since 2001. Waldron has worked in this business for 42 years and worked with GWBD since 1997. Pursuant to their agreements with GWBD, Waldron and Mills only distribute GWBD products and have customized trucks and uniforms that reflect logos for GWBD products.

The parties in this case have been engaged in litigation in various forums since April 2005. In March 2008, this litigation culminated in a bench trial before Justice Crowley in the Maine Superior Court. On April 8, 2008, a written decision in favor of GWBD was issued. Plaintiffs then began the process of appealing that decision to the Law Court. In July 2008, with the brief deadline quickly approaching, counsel for Plaintiffs initiated settlement negotiations. At the crux of this case are settlement negotiations that took place on July 10, 2008. The Court recounts what happened on that day in as much detail as the record allows:

At 11:13 AM on July 10th, Attorney Mellor, acting as counsel for Waldron and Mellor, left the following voicemail for Attorney Erwin, counsel for George Weston Bakeries:

> Hello Jim, Patrick Mellor calling regarding Waldron and Mills. My clients asked me to give you a call before we made any submissions today to the Law Court to see if there was a potential settlement whereby your client would pay $15,000 for my clients' dismissal of the case, against my better judgment, but my clients have indicated that things have been going better. They would like to try to resolve this so if you are willing to give me a shout, I would appreciate it 594-8400. I will be heading down to Boothbay this afternoon for a Zoning Board of Appeals meeting. I'll probably be leaving the office around 2:30; my cell phone is 632-5395. Please get in touch with me before the day gets too old. Again 632-5395 is the cell. Thanks Jim.

(Joint Ex. 1 ¶ 6.)

At 1:57 PM, Attorney Mellor sent Attorney Erwin an email that outlined the issues Plaintiffs would raise in their appeal.  The email also stated:  "My clients have given me final settlement authority of $5000.  If we are forced to file Appellant's Brief offer will be off the table." (Joint Ex. 1.C.)  Within five minutes of sending that email, Attorney Mellor followed up by calling Attorney Erwin; Mellor left the following voicemail message at that time:

> Jim, this is Patrick Mellor calling. I understand your position and I spoke with my clients and here is what I would like to see.  You check your e-mail; you'll see an e-mail from me on the items on appeal. My clients are not going to put this behind them regardless of how the appeal comes out. That is, there will be information provided to the appropriate taxing authorities, workers compensation board, etc. If we're not able to come to a mutually agreeable settlement today, and I understand that's quick but we're talking about $5,000, Jim, which is much less than what it'll cost your client to work on this appeal. If the appeal is, I mean if the settlement is not agreeable then all bets are off. There will be no offer of settlement beyond today and your clients can expect to continue to be involved in some type of hearings of some nature, proceedings of some nature in the near future regarding their status of an employer as opposed to an independent business entity or there can be a settlement. I hope that's the way we go.  I'm heading down to a Board of Appeals meeting. I have my assistant on standby here. I can let her know what to do. My cell phone is 632-

>    5395, 632-5395, and I hope we're able to get this resolved.  Take care Jim. Bye
>    bye.

(Joint Ex. 1 ¶11 & Joint Ex. 1.B.)  At 5:39 PM, Attorney Erwin responded to these messages from Plaintiffs' Counsel with an email, which read: "Patrick, due to the lateness of our exchange, Shelly Seligman has not been able to discuss your demand internally with her client.  We'll get back to you tomorrow."  (Joint Ex. 1.D.)

No settlement was reached.  Instead, on July 15, 2008, both Plaintiffs received hand-delivered letters that notified them that their distribution rights were being terminated immediately.  Both termination letters stated that the notice was "in response to your recent July 10, 2008 attempt to extort money from [GWBD]" and recounted an excerpt from the second voicemail left by Attorney Mellor had left for Attorney Erwin. (See July 15, 2008 Notice of Termination of Distribution Agreement (Joint Exs. 1.E & 1.F).)  The letters explained GWBD's position that the July 10, 2008 activity was a "threat to do significant harm to GWBD if it does not meet your demand" and that this activity thus "constitute[d] a non-curable breach of your Distribution Agreement." (Id.) In fact, the Distribution Agreements between GWBD and Waldron and Mills contain a section titled "Non-Curable Breach" that reads: "If the breach by Distributor involves criminal activity or fraud, threatens public health or safety or threatens to do significant harm to [GWBD], its affiliates, trademarks or commercial reputation, [GWBD] may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure."  (Distribution Agreement §8.2 (Pls. Ex. 33).)

William Sullivan, the Director of Sales, made the decision that Attorney Mellor's message for Attorney Erwin violated Section 8.2 of the Distribution Agreements requiring immediate termination.  On July 11, 2008, the text of Attorney Mellor's second

4

voicemail was read to Sullivan over the phone by in-house counsel for GWBD. (See Def. Ex. 5.) Sullivan did not listen to the voicemail himself. Sullivan was also told that Attorney Mellor had made an offer of $15,000 to settle the dispute between the parties prior to the voicemail in question. However, it does not appear that he asked for or received any information about any other communications that might have provided context for the voicemail message. Sullivan testified at the hearing that he believed the voicemail qualified as criminal activity, a threat to public health or safety and a threat to do significant harm to GWBD, thereby providing multiple bases for finding a non-curable breach.

At the hearing, Sullivan explained that the threat to do significant harm was the demand for $5,000 to settle the case combined with the assertion that Plaintiff would report GWBD to the I.R.S. or other administrative agencies if a settlement was not achieved.[1] In Sullivan's assessment, a report to such an agency would result in GWBD incurring additional expenses. Alternatively, Sullivan was concerned that if GWBD made the $5,000 payment requested, Mills and Waldron might still report GWBD to an administrative agency and/or other distributors would find out about the payment and presumably make similar threats. In short, Sullivan felt the settlement demand presented GWBD with a Hobson's Choice.

---

[1] The record suggests that Plaintiffs had on previous occasions raised with GWBD their position that there were grounds for reporting GWBD to various administrative agencies, such as the Maine Unemployment Insurance Commission. While the Court states no opinion on the merits of any claim or complaint that might be brought before an administrative agency, the Court notes that nothing in the record suggests that Plaintiffs' claims in that regard would be patently frivolous and devoid of any merit. Rather, the fact that there were multiple forums in which GWBD could face challenges as to whether its distributors like Waldron and Mills were employees or independent operators was raised on numerous occasions. (See, e.g., Pls. Ex. 1, 31 & 32.)

Sullivan's decision to terminate the Distribution Agreements with Waldron and Mills was finalized by the evening of July 11th, and he signed termination letters that had been drafted by in-house counsel. Ultimately, Sullivan's decision was based solely on the July 10th voicemail message from Attorney Mellor. Although he testified that he considered the July 10th voicemail to amount to criminal extortion, Sullivan notably took no steps to contact law enforcement and there is no record that anyone associated with GWBD actually contacted the authorities to report an attempted theft by extortion.[2]

Under the terms of the Distribution Agreement, an immediate termination, such as the terminations at issue here, entitles GWBD to begin operating the terminated distribution routes "deducting from the revenues generated the reasonable expenses of such performance" and delivering the balance to the distributor, in this case Waldron and Mills, who still own the distribution rights. The distributor then has 90 days to find a qualified buyer for the route. If a sale is not consummated within 90 days, GWBD has the right under the contract to sell the route itself for "the best price which can be obtained after proper notice and advertisement." (Distribution Agreement §8.4 (Pls. Ex. 33).) Per this provision of the Distribution Agreement, GWBD is currently operating the routes of both Waldron and Mills. Defendant did offer to maintain this status quo during the pendency of this litigation and thereby simply continue to operate the routes without invoking the right to sell until the Court ordered that GWBD was entitled to sell each of the routes.

---

[2] In addition, as the Court briefly noted on the record at the hearing, to the extent that GWBD invoked attorney-client privilege with respect to what research was done in connection to confirming that the July 10th voicemail amounted to criminal activity, the finder of fact is entitled to draw an adverse inference pursuant to Federal Rule of Evidence 501 and Maine Rules of Evidence 502 and 513.

Despite this offer, Plaintiffs continued to press their request for injunctive relief. As Plaintiffs explained at the hearing, the damage to the good will with their customers as well as the loss of sales and the required "reasonable expenses" incurred by GWBD's operation of their routes makes the current situation untenable. In short, they argue that the current state of affairs is irreparably harming their distribution routes. Overall, the testimony of Waldron and Mills established that good will is a significant aspect of what they do as they visit their customers and stock the shelves each week. On the current record, it is clear that allowing the Waldron and Mills routes to be operated by substitutes (who are not invested in either the long term value of these routes or working with the customers to increase goodwill and sales) will have an impact that is not readily quantifiable.

With respect to Waldron, even Defendant admitted that the average net weekly sales have changed significantly since they started operating his route. (Def. Ex. 2.) All sides agree that the drop in sales on the Waldron route is primarily the result of the decision by Sam's Club to no longer stock and sell Thomas bagels. Although this was apparently a national decision by Sam's Club, Waldron credibly testified that he had established a relationship and good will with this particular store and that if he had been allowed to continue to service this part of his route, Sam's Club may have continued to stock Thomas bagels (at least for some additional period of time).

With respect to Mills, it appears that the average weekly sales have remained about the same since GWBD started operating his route. Of course, the amount that will be paid to Mills is lowered by the expenses being charged by GWBD.[3] Ultimately, Mills

---

[3] For both Mills and Waldron, these expenses have included the cost of truck rental because GWBD has refused to use their trucks due to concerns about who would pay repair costs.

also credibly testified that good will with his customers, such as Target, is being lost as a result of his inability to have regular contact with his customers and that the long term impact of having a substitute operate his route could impact his shelf space and sales going forward.

## III. DISCUSSION

### A. Substantial Likelihood of Success

Plaintiffs' Amended Complaint currently contains five counts: (1) Breach of Contract, (2) Tortious Interference of Economic Advantage, (3) Restraint of Trade pursuant to 10 M.R.S.A §1101 et seq., (4) Violation of Good Faith and Fair Dealing under the U.C.C. and (5) a request for declaratory judgment. Counts II and III are the subject of a pending motion to dismiss and, for this reason, the Court does not consider these counts in its assessment of Plaintiff's likelihood of success. Rather, the Court focuses on Plaintiff's breach of contract claim and the request for declaratory judgment.[4] In the Court's assessment, Plaintiffs have a substantial likelihood of success on these claims. By any objective measure, Defendant's assertion that Attorney Mellor's July 10th voicemail meets the requirements for the crime of threat by extortion is completely unreasonable. See 17-A M.R.S.A § 355. Moreover, the lack of action by the Defendant reporting this alleged extortion to the authorities is evidence that they did not even subjectively believe that the voicemail message was an attempt at criminal extortion. In short, there is no basis for claiming non-curable breach based on criminal activity or threat to the public.

---

[4] This includes Plaintiffs' claims under Count IV for violation of the Uniform Commercial Code good faith and fair dealing since under New York law this U.C.C. provision does not give rise to an independent cause of action. See, e.g., Grain Traders, Inc. v. Citibank, N.A., 960 F. Supp. 784, 792 (S.D.N.Y. 1997).

Turning to Defendant's assertion that the July 10th voicemail was a "threat to do significant harm" to GWBD, the Court finds GWBD's invocation of this provision in response to Attorney Mellor's voicemail bewildering and troubling. The claimed "threat" is that Plaintiffs would report GWBD to various administrative agencies as taxing authorities. Assuming for the moment that this statement could even be considered a "threat" in the context of the parties' ongoing litigation, what is the "significant harm"? If Plaintiffs' complaints are devoid of merit, GWBD would ultimately obtain a ruling in their favor and the only harm would be the fees paid and time spent on the administrative proceeding. In the context of GWBD's business and this record, the Court does not see how this amounts to a "significant harm." Alternatively, GWBD perceived Plaintiffs' suggestion that they would pursue various administrative complaints as a "threat to do significant harm" because the claims had merit. Under this option, GWBD is essentially asking this Court to endorse the view that the contract allows them to terminate any distributor who asserts that they are going to pursue a valid claim or complaint that would result in a ruling against GWBD. Such a reading of the contract would likely be void and unenforceable as a matter of public policy.

In short, the Court does not see a valid basis for the termination of Waldron and Mills pursuant to Section §8.2 of the Distribution Agreements and believes that Plaintiffs have a substantial likelihood of success on their breach of contract claims. The parties have spent substantial time and energy discussing issues related to Attorney Mellor's authority and whether his statements can be imputed to Waldron and Mills. In the Court's initial assessment, it does not even reach these issues. Rather, given the current state of the record, the Court sees a garden-variety settlement negotiation that Defendant

has inexplicably and unreasonably perceived and labeled as a "threat to do significant harm" in order to justify its termination of Waldron and Mills. In the Court's assessment, Plaintiffs have a substantial likelihood of proving that Defendant's invocation of the "Non-Curable Breach" provision of the contract was done in bad faith.

### B. Irreparable Harm

Given the record established at the hearing, the Court finds that Plaintiffs will suffer irreparable harm absent a preliminary injunction. If Plaintiffs are ultimately successful on their claims, some aspects of their damages are easily reduced to money damages, such as the "reasonable expenses" charged for operating their routes. However, it is clear that Plaintiffs' absence and the operation of Plaintiffs' routes by substitutes will continue to impact the good will each of them establish through regular weekly contact with their customers. It will be very difficult, if not impossible, for the Court to determine how and if that good will would have increased sales during the period that GWBD was operating Plaintiffs' routes. Under these circumstances, a finding of irreparable harm is warranted. See, e.g., Dominion Video Satellite, Inc. v. EchoStar Satellite, 269 F.3d 1149, 1156-57 (10th Cir. 2001); Ross-Simons, 102 F.3d at 18-19; SMC Corp., Ltd. V. Lockjaw, LLC, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007).

In this case, GWBD's termination of Plaintiffs' routes have literally left them with no business and nothing to do since they solely distribute GWBD products. In the Court's assessment, this unique relationship that GWBD has with Waldron and Mills as well as the unique relationship Waldron and Mills maintain with the stores on their routes distinguishes this case from New England Surfaces v. E.I. DuPont De Nemours & Co., No. 06-CV-89-P-S, 2006 WL 1554776 (D. Me. June 1, 2006). As compared to New

England Surfaces, this case has a much higher likelihood of success combined with a greater irreparable harm; thus, placing this case much higher on the preliminary injunction "sliding scale." Ty, Inc. v. Jones Group, Inc., 237 F.3d 891 (7th Cir. 2001) (explaining that the preliminary injunction "process involves engaging in . . . the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position").

### C. Balancing of the Hardships

In this case, the Court believes that the balance of hardships clearly tilts in favor of granting Plaintiffs the requested injunctive relief. The ongoing irreparable harm to Plaintiffs absent an injunction has already been discussed by the Court. By contrast, the Court sees minimal harm to Defendant if an injuction were granted.

Admittedly, Mr. Sullivan testified that he now has concerns that GWBD might be harmed if Waldron and Mills were allowed to run their routes.[5] However, in the Court's assessment, these concerns are overly speculative and not well founded. If Waldron or Mills were to take steps to "sabotage" GWBD products while running their routes under a preliminary injunction, the result would clearly negatively impact each of them in both the short and long term regardless of the outcome of this litigation. In addition, the Court notes an injunction will in all likelihood actually help preserve the equity of both distribution routes. As Sullivan testified, if GWBD were to operate each of the Plaintiffs' routes for an extended period of time, there is the potential that the operating expenses would exceed the equity of the routes thereby resulting in a loss for GWBD since they would be required to absorb any loss that exceeds the equity of the route at the time of

---

[5] On cross-examination, Sullivan admitted that he had no reason to be concerned that Waldron or Mills would "sabotage" GMBD or its products prior to July 11, 2008.

11

sale. Given this potential, it appears that both parties may ultimately benefit from an injunction that preserves the pre-termination status quo until the Court can rule on the merits of Plaintiffs' claims.

**D.     Public Interest**

Stripped to its essence, this case is a contract dispute between private parties and as such there is no public interest that is affected by the Court's decision to grant or deny injunctive relief. Under these circumstances, the Court gives little to no weight to the public interest factor. However, given the Court's assessment on the current record that the actions by Defendant inappropriately invoked claims of criminal activity and potentially adopted a reading of a contract that could be void for public policy reasons, the Court believes that any public interest existing in this matter is generally better served by an injunction. The absence of injunctive relief on the current record could also have an adverse impact generally on the ability of counsel to engage in frank, productive settlement negotiations.

**E.     Security**

At the close of the evidentiary hearing, Defendant raised the issue of security and requested that the Court require each Plaintiff to post security equal to the respective fair market values of their routes. The explicit purpose of requiring security is to "pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Absent a clear showing of severe financial hardship, the Court is required to have a party post security that properly serves this purpose.[6]

---

[6] Notably, Plaintiffs did not object to the request for a bond or make any showing that Plaintiffs are financially unable to post security. However, Plaintiffs did generally present evidence that allows the Court to conclude that requiring each Plaintiff to post a bond in the amount of the fair market value of their route would be a significant financial hardship.

In the Court's assessment, it believes that this purpose would be achieved by requiring each Plaintiff to post a $1,000.00 bond. Thus, the preliminary injunction granted to each Plaintiff will be conditioned on that Plaintiff posting a bond in this amount. The Court notes that Defendant can readily return to Court if and when it appears that Plaintiffs are not fulfilling their weekly obligations or otherwise "sabotaging" GWBD business (which was the concern stated at the hearing). Under these circumstances, this Court would quickly modify the relief granted via this Order and allow Defendant to execute on the $2,000 in security and recover any provable damages up to that amount. Absent any sabotage or misconduct by Plaintiffs, the damages sustained by Defendant solely because it was wrongly enjoined will be minimal. Thus, these respective bonds will adequately cover Defendant in the unlikely situations in which it sustains any damage as a result of this injunction. However, by setting the bond at an amount lower than requested by Defendant, the Court has attempted to ensure that the bond is not cost prohibitive for Plaintiffs, which would make the injunctive relief granted via this Order illusory.

## IV. CONCLUSION

The Motion for Preliminary Injunction (Docket # 5) is hereby GRANTED. Defendant is hereby ENJOINED from selling the distribution rights of either Robert Waldron or Christopher Mills until further order of this Court. Defendant is also ENJOINED from invoking the provisions of Section 8.4 of the Distribution Agreements. To the extent that Defendant is already operating Plaintiffs' routes pursuant to this Section, the parties are to confer and develop a plan for Waldron and Mills to return as operators of these routes as they were doing prior to July 15, 2008. This plan shall take

effect as soon as practicable and no later than September 17, 2008.  The injunctive relief granted by this Order and each Plaintiff's ability to return to operating his route is contingent on each Plaintiff posting a bond in the amount of $1,000.00.  If the parties are unable to reach agreement on a plan for implementing this preliminary injunction, they shall notify the Court of the need for a conference as soon as possible.

The parties are once again put on notice that evidence received at the September 9, 2008 hearing "that would be admissible at trial [will become] part of the trial record and need not be repeated at trial." Fed. R. Civ. P. 65(a)(2).  However, having reviewed all of the evidence received the Court has determined that it would be inappropriate to make a decision on the merits at this time.

SO ORDERED.

                                              /s/ George Z. Singal  
                                              Chief U.S. District Judge

Dated this 10th day of September, 2008.